OPINION
{¶ 1} Defendant-appellant, Jim Gonzalez ("appellant"), is appealing from his convictions of the charges of rape and gross sexual imposition. He assigns six errors for our consideration:
 I. The trial court improperly limited Appellant's cross examination of witnesses with respect to prior inconsistent statements made by the alleged victim, in violation of the Ohio Rules of Evidence.
 II. The trial court improperly limited Appellant's cross examination of witnesses with respect to prior inconsistent *Page 2 
statements made by the alleged victim, in violation of confrontation and due process protections under the state and federal Constitutions.
 III. The trial court improperly limited Appellant's cross examination of witnesses with respect to prior inconsistent statements made by the alleged victim, in violation of the Ohio Rules of Evidence regarding impeachment.
 IV. The trial court erred in limiting cross-examination by improperly finding that counsel was trying to impeach the credibility of his own witness.
 V. There was insufficient competent, credible evidence to support the jury's verdict, thereby, denying Appellant due process under the state and federal Constitutions.
 VI. The verdict of the jury was against the manifest weight of the evidence.
 {¶ 2} Because the first four assigned errors involve common issues, we will initially address them jointly.
 {¶ 3} These charges against appellant flowed from the statements of AT, who alleged that appellant fondled her and stuck his fingers inside her. No physical evidence supported her statements, so the criminal case turned entirely upon whether or not AT, who was age eight at the time of trial, was telling the truth when she said appellant had sexually assaulted her. Stated differently, AT's credibility was critical to the jury's verdicts of guilty or not guilty.
 {¶ 4} The judge presiding over the trial limited the questions which could be asked persons who heard or were aware of statements made by AT. Defense counsel argued that AT had changed her claims about what happened and that the jury should be informed about the changes in what AT alleged when determining AT's believability. The assistant prosecuting attorney who presented the State of Ohio's case opposed the *Page 3 
testimony about possible changes in AT's allegation, arguing that the defense was trying to place impermissible hearsay before the jury.
 {¶ 5} "Hearsay" is defined in Evid. R. 801(C) as follows:
 Hearsay. "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.
 {¶ 6} For AT's statements to be hearsay, they had to be offered for the truth of the matter asserted within the statement. Defense counsel was not offering the statements for the supposed truth of the information contained within the statements. In fact, defense counsel was trying to prove the opposite — the content of AT's statements in court were false. Defense counsel was asserting that conflicting statements were made.
 {¶ 7} Defense counsel's arguments correctly set forth the theory that AT's other statements should be admissible because the statements were made, not because the statements were true. The other statements of AT were offered as verbal acts, for the fact the statements were made, regardless of their truth or falsity.
 {¶ 8} The concept of verbal acts is frequently misunderstood by attorneys and trial judges. A simple example may help clarify the concept. In a civil suit, the fact that a grocery store employee warned a customer about a broken bottle of ketchup in a grocery store aisle could be critical to a jury's determination of whether or not the grocery store is liable for the customer's fall in the ketchup. If an employee yelled out to the customer, "watch out for the ketchup!" the responsibility for the fall might well rest with the customer. The warning "watch out for the ketchup!" would be offered for the fact that warning was given not for any truth of its content. The warning was a verbal act. *Page 4 
 {¶ 9} Defense counsel at the trial opposed the prosecution's assertion that AT's prior statements were inadmissible hearsay with the following:
 It's not hearsay. We're not offering it to prove the truth of the matter asserted, just that she said it. It's an inconsistent statement.
(Tr. at 265.)
 {¶ 10} Defense counsel repeated this argument in a sidebar conference immediately after:
 Your honor, I don't think it's even hearsay. We're not offering it for the matter asserted, just to show that she's making a different statement than she made before.
(Tr. at 266.)
 {¶ 11} The trial judge was clearly wrong in labeling AT's statements as "hearsay," given the use defense counsel intended. However, other rules of evidence come into play when attempts are made to use prior inconsistent statements of a witness. Specifically, Evid. R. 613(B) states:
 Extrinsic evidence of prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is admissible if both of the following apply:
 (1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;
 (2) The subject matter of the statement is one of the following:
 (a) A fact that is of consequence to the determination of the action other than the credibility of a witness; *Page 5 
 (b) A fact that may be shown by extrinsic evidence under Evid. R. 608(A), 609, 616(A), 616(B) or 706;
 (c) A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence.
 {¶ 12} While it may seem odd to require defense counsel to inquire of a young child about who all the child told what details of claims of sexual abuse, that is exactly what the Ohio Rules of Evidence require. AT had to be confronted with alleged inconsistencies in her statements and given an opportunity to explain or deny the alleged inconsistencies.
 {¶ 13} With that legal evidentiary background, we turn to the four specific assignments of error regarding the curtailing of the examinations or cross-examinations of witnesses about alleged inconsistencies in AT's claims about being sexually abused.
 {¶ 14} The first assignment of error addresses the testimony of Brian Sheline, a detective who investigated AT's allegations about being sexually abused. Defense counsel attempted to elicit from Detective Sheline's testimony about whether or not AT had told him that appellant had kissed her during her encounter with appellant. AT had made a claim during her testimony in court that appellant had given her a short kiss.
 {¶ 15} On cross-examination, AT testified that she did not tell her friend Aaryanna that appellant kissed her and put his tongue in her mouth. AT also testified that she told a person at the hospital where she was examined days later that appellant kissed her. AT was not asked whether or not she told police appellant kissed her. Because AT was never asked about any statements to the police regarding kissing, Evid. R. 613(B) barred *Page 6 
asking Detective Sheline about an alleged difference in AT's statements about whether or not appellant kissed her. The trial court made the right ruling for the wrong reasons.
 {¶ 16} AT did not claim that she even had a conversation with Aaryanna's mother about what she alleged appellant had done to her. Defense counsel never asked AT what statement AT had made to Aaryanna's mother or AT made to Aaryanna in Aaryanna's mother's presence. Again, defense counsel did not ask the questions necessary to comply with Evid. R. 613(B). Again, the trial judge made the right ruling for the wrong reasons.
 {¶ 17} The curtailing of the cross-examinations of Detective Sheline and the examination of Aaryanna's mother was correct because defense counsel did not comply with Evid. R. 613(B). Those are the only errors alleged under the first assignment of error. As a result, the first assignment of error must be and is overruled.
 {¶ 18} The second assignment of error does not allege any specific errors other than the errors with regard to the testimony of Detective Sheline and Aaryanna's mother. Since no errors occurred with respect to these two witnesses, as explained above, the second assignment of error must be and is also overruled.
 {¶ 19} Likewise, the third assignment of error attacks the limitations of the questioning of the same two witnesses. For the same reasons set forth above, the third assignment of error is overruled.
 {¶ 20} The fourth assignment of error addresses the testimony of Aaryanna, who was called as a witness in the defense case. This assignment of error states that the trial court limited cross-examination, but since Aaryanna was called as a witness in the *Page 7 
defense case, the issue is whether the trial court improperly limited the direct examination of a defense witness.
 {¶ 21} Aaryanna was an eight-year-old friend of AT. Aaryanna was the first person to whom AT made the claim that appellant had sexually assaulted her. Aaryanna testified that AT told her it was a secret that the man was rubbing her private parts and kissing her. AT did not want Aaryanna to tell AT's mother, but Aaryanna did anyway. AT's mother then immediately called the police.
 {¶ 22} Defense counsel attempted to elicit statements he alleged had been made to him by Aaryanna a few days earlier. Counsel asked:
 Q. And when I talked to you, did you tell me that [AT] told you that he made her grab him, his private parts?
 MS. RAUSCH: Objection.
 THE COURT: Sustained.
 THE WITNESS: No.
(Tr. 439.)
 {¶ 23} In this situation, defense counsel did not fail to ask the appropriate questions of AT during AT's testimony. Counsel specifically asked AT:
 Q. Did you tell Aaryanna that Mr. Gonzalez made you touch his private part?
 A. No.
(Tr. 99.) Counsel also asked AT if she had told Aaryanna that appellant pulled her (AT) off the couch or that appellant's daughter CL was asleep when the touching happened. All of these allegations would have differed with AT's in-court testimony. *Page 8 
 {¶ 24} Counsel for appellant returned to this line of questioning shortly after discussing the issues with the court at a sidebar conference. When counsel asked about what AT told Aaryanna about CL (appellant's daughter), Aaryanna agreed that AT had told her CL was asleep. Aaryanna also testified AT told her appellant had pulled AT off the couch. Aaryanna denied that AT said appellant stuck his tongue in AT's mouth.
 {¶ 25} Since most of the questions defense counsel wanted to ask were ultimately asked and answered, we can find no prejudice from the trial court's failure to immediately declare Aaryanna to be a hostile witness as to these questions. The remaining question, had Aaryanna been declared a hostile witness, apparently would have been a question about the forced touching of appellant's private parts prefaced by "Didn't you tell me a few days ago," and a question about a claim appellant stuck his tongue in AT's mouth, again prefaced by "Didn't you tell me."
 {¶ 26} Both of the remaining questions were answered in the negative by Aaryanna without the "Didn't you tell me" preface. The record is devoid of information about defense counsel's apparent interview with Aaryanna and what Aaryanna actually said then; we cannot say that Aaryanna would have testified differently had defense counsel asked his questions of eight-year-old Aaryanna differently.
 {¶ 27} Based upon the record before us, we cannot say the trial court erred in failing to declare Aaryanna to be a hostile witness.
 {¶ 28} The fourth assignment of error is overruled.
 {¶ 29} The fifth and sixth assignments of error address the sufficiency and weight of the evidence, in that order. We will address these assignments of error together. *Page 9 
 {¶ 30} Sufficiency of the evidence is the legal standard applied to determine whether the case should have gone to the jury. State v.Thompkins (1997), 78 Ohio St.3d 380, 386. In other words, sufficiency tests the adequacy of the evidence and asks whether the evidence introduced at trial is legally sufficient as a matter of law to support a verdict. Id. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, syllabus paragraph two, following Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781. The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact. Jenks, at 273. If the court determines that the evidence is insufficient as a matter of law, a judgment of acquittal must be entered for the defendant. SeeThompkins, at 387.
 {¶ 31} Even though supported by sufficient evidence, a conviction may still be reversed as being against the manifest weight of the evidence.Thompkins, at 387. In so doing, the court of appeals, sits as a "`thirteenth juror'" and, after "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id. (quoting State v. Martin [1983], 20 Ohio App.3d 172, 175); see, also, Columbus v. Henry (1995), 105 Ohio App.3d 545, 547-548. Reversing a conviction as being against the manifest weight of the evidence should be reserved for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins, at 387. *Page 10 
 {¶ 32} As this court has previously stated, "[w]hile the jury may take note of the inconsistencies and resolve or discount them accordingly, see [State v.] DeHass [(1967), 10 Ohio St.2d 230], such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." State v. Nivens (May 28, 1996), Franklin App. No. 95APA09-1236. It was within the province of the jury to make the credibility decisions in this case. See State v. Lakes (1964), 120 Ohio App. 213, 217 ("It is the province of the jury to determine where the truth probably lies from conflicting statements, not only of different witnesses but by the same witness.")
 {¶ 33} See State v. Harris (1991), 73 Ohio App.3d 57, 63 (even though there was reason to doubt the credibility of the prosecution's chief witness, he was not so unbelievable as to render verdict against the manifest weight).
 {¶ 34} As to the sufficiency or insufficiency of the evidence issue, AT's testimony was clearly sufficient to support the jury's guilty verdicts. AT clearly testified that appellant fondled the area of her breasts and fondled her buttocks. Given AT's age, that testimony satisfied the elements of gross sexual imposition in violation of R.C. 2907.05.
 {¶ 35} R.C. 2907.05 reads:
 (A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
 * * *
 (4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person. *Page 11 
 {¶ 36} AT also testified that appellant inserted his fingers into her vagina. Again, given her age, that testimony satisfied the elements of R.C. 2907.02, which reads:
 (A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:
 * * *
 (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.
 {¶ 37} The evidence presented at trial was sufficient to support the jury verdicts.
 {¶ 38} The fifth assignment of error is overruled.
 {¶ 39} Since we, as a court, must analyze and weigh all the evidence presented at trial in determining whether the jury verdicts were against the manifest weight of the evidence, we will set forth a summary of the testimony of each of the witnesses, both those for the prosecution and the defense.
 {¶ 40} AT was the first witness. After her competency to testify was established, she described in detail the occurrences on the evening she said she was sexually assaulted. She testified that she was lying on the floor watching Scooby-Doo on television. Appellant, his infant son and daughter CL were also lying on the floor. AT said her head was toward the television and her legs away from the television. The other three were lying with their feet toward the television and their heads away. AT was on one end of the group of four and CL was at the other end. Appellant was lying between AT and his infant son. All were covered by a blanket. *Page 12 
 {¶ 41} AT testified that appellant slipped his hand under the T-shirt she was wearing for pajamas, fondled her buttocks under her panties and fondled her breast area. She testified that appellant next slipped his fingers under her panties and inserted his finger into her vagina. AT claimed she did not cry out because she was afraid. She did not leave after the incident. She first claimed appellant had assaulted her two days later when AT talked to her young friend Aaryanna.
 {¶ 42} Aaryanna told AT's mother, who then called the police. AT was transported to the Emergency Room of Nationwide Children's Hospital where she was interviewed and examined. No abnormal physical findings were reported.
 {¶ 43} AT claimed she did not tell her mother of the incident out of fear that her mother would feel AT did something wrong and punish her physically. After Aaryanna repeated AT's claims of sexual abuse, AT told police and hospital personnel what she said happened.
 {¶ 44} On cross-examination, AT acknowledged that she was unhappy with appellant's daughter CL during this general time frame, but denied that she said appellant assaulted her in order to get back at CL. AT claimed CL was aware of the assault and states, in response to a question from defense counsel, that CL said appellant did such things to all CL's friends who spent the night.
 {¶ 45} The second witness in the State's case was Russ Morrow, a Columbus Police Officer. Officer Morrow was dispatched to AT's residence to investigate a report of a sexual activity. Officer Tonia Allen, a female police officer being trained by Officer Morrow, asked questions of AT about what happened. They then called a medic squad to check AT out. A second police car with a female officer was summoned to follow-up. *Page 13 
 {¶ 46} Officer Morrow and Officer Allen then went to appellant's apartment to discuss AT's allegations with him. When AT indicated to police that appellant was the man she had been accusing, appellant was taken into custody.
 {¶ 47} On cross-examination, Officer Morrow indicated that he did not do a full investigation of what happened. He left that to police detectives to follow-up.
 {¶ 48} The third witness was JT, AT's mother. JT testified that she had lived with four of her five children and with her boyfriend of seven years, Brian. For seven years, JT had lived at the apartment over the fence from where appellant and his family lived, but JT had moved about three months before trial. AT, Aaryanna, and appellant's daughter CL played outside together frequently. On the night of April 11, 2007, AT spent the night at a sleepover at CL's apartment. When AT returned home, JT perceived AT as being moody, but JT attributed this to a lack of sleep at the sleepover.
 {¶ 49} JT had a birthday party for another one of her daughters on April 12 and CL was invited. AT wanted AT's sister to accompany her to the back fence to summons CL to the party.
 {¶ 50} The next day, Aaryanna, who had been talking to AT, ran up to JT and said she had something real bad to tell JT. After being told about AT's claim that appellant had sexually assaulted her, JT got very upset and went to Aaryanna's mother's house to call police. JT did not ask AT questions because JT was so upset.
 {¶ 51} On cross-examination, JT testified AT spent the night at CL's house "about three times," but nothing happened on the other occasions, at least to JT's knowledge. JT was not aware of any of AT's other friends having problems at CL's house. *Page 14 
 {¶ 52} JT's boyfriend told JT that AT came home between 8:30 and 9:00 on the morning after the sleepover. JT was at work at the time. JT said AT never tells her lies. JT also testified AT was in counseling two days a week at school.
 {¶ 53} On re-direct examination, JT said she felt AT did not tell her what happened in order to protect her (JT). JT also said AT was slow to want to go get CL for the party and had to be ordered to do it.
 {¶ 54} The fourth witness was Elizabeth Ann Claxton, who works at Nationwide Children's Hospital Emergency Department as an attending physician. Dr. Claxton described the procedure in the emergency room for dealing with children who present with a claim of sexual abuse. She performed a physical examination of AT on April 13, 2007. Dr. Claxton identified the medical records relating to that examination which were subsequently admitted into evidence. The history obtained from AT at that time parallels AT's testimony at trial, except AT stated that appellant told her to "come here" before he touched her.
 {¶ 55} Dr. Claxton found no physical evidence of sexual abuse, but indicated that such a finding neither confirms nor refutes a claim of sexual abuse.
 {¶ 56} The next witness at trial was Jan Bruhn who is a licensed social worker at Nationwide Children's Hospital. Bruhn works in the emergency room, frequently taking interviews from children who report being sexually abused. She also interviews parents of such children, usually in a separate room. Bruhn interviewed AT alone and related AT's statements as contained in the medical records. Those statements parallels AT's in-court testimony. *Page 15 
 {¶ 57} The final witness for the State was Brian Sheline, a detective with the Columbus Division of Police. He is assigned to investigate sexual abuse claims involving children as a member of the Special Victims Bureau. He interviewed AT in April 2007 after she alleged sexual abuse. He also interviewed Aaryanna. He also took pictures inside appellant's residence which were admitted into evidence and he confiscated a Scooby Doo videotape.
 {¶ 58} On cross-examination, Detective Sheline was questioned about AT's statements to him, but the questions were subject to objections which were sustained.
 {¶ 59} The first witness for the defense at trial was Jolie Brams, M.D., Ph.D., a licensed clinical psychologist. She gave an extended presentation of her qualifications to testify as an expert and was ultimately considered qualified to give expert testimony.
 {¶ 60} Dr. Brams was critical of the procedure and protocols used by a social worker who interviewed AT at Nationwide Children's Hospital, especially the failure to videotape AT when she was interviewed. Dr. Brams also testified about the risk of interviewer bias having an impact on a young child who has alleged or is alleging sexual abuse. Next she addressed the impact of post-event occurrences and suggestions on an individual's memory of the event.
 {¶ 61} Dr. Brams was critical of the fact that AT first made a claim about what occurred to her friend Aaryanna and not to her own mother. A young child with a healthy relationship with her mother would be expected to relate a troubling event to her mother, in Dr. Brams' view. Dr. Brams also was critical of the fact AT did not flee appellant's residence immediately, or at least as soon as possible, if sexual abuse occurred. Dr. *Page 16 
Brams also discussed delayed reporting of sexual abuse and the tendency of a child to retaliate against another child who has displeased her or him.
 {¶ 62} On cross-examination, Dr. Brams acknowledged that all children are different. Dr. Brams also acknowledged that some of the problems with young children are encountered when there are repetitive interviews and that the social workers at the emergency room of Nationwide Children's Hospital are trained in how to interview children. Dr. Brams testified that she had not talked to the social worker who interviewed AT at Nationwide Children's Hospital or to AT directly.
 {¶ 63} The second defense witness was E Cruz, the wife of appellant. Cruz was at work from 10:00 p.m. to 6:00 a.m., which included the time when AT claimed she was fondled. When Cruz returned from work, her daughter CL and AT were asleep in the bedroom with the bedroom door locked. Cruz woke the girls up so she could get clothing for her husband to wear to work. AT did not leave immediately, but stayed to play with CL and to eat breakfast. AT finally left around noon, by Cruz's recollection.
 {¶ 64} The third witness was CL, who was nine years old at the time of trial. CL remembered lying in the living room watching television with AT for only about two minutes. The girls then went to the bedroom and watched a different movie, Anastasia. CL did not recall appellant saying "come here" or anything like that to AT. CL saw no inappropriate touching.
 {¶ 65} CL did not hear any crying or other signs of discomfort from AT. CL recalls waking up twice that morning, the second time when her mother was making pancakes. CL did not claim her mother awakened her. *Page 17 
 {¶ 66} CL testified that AT was mad at her because AT's sister took a birthday card CL had made the sister and did not immediately take the card AT had made. CL said AT took her card and tore it up. CL denied making a statement to AT that CL's father had touched other girls who spent the night before.
 {¶ 67} On cross-examination, CL testified that she did not really remember much of what happened that night because it was long ago. When shown State's exhibit C, which was AT's diagram of how people were lying in the living room, CL disagreed with it and said she was lying next to her father, not her brother.
 {¶ 68} CL recalled police came to talk to her days later. CL claimed police took the Anastasia tape, however, the videotape in evidence is Scooby-Doo and the Reluctant Werewolf. CL also testified Scooby-Doo was on the television, not a videotape.
 {¶ 69} The assistant prosecutor asked for a recess so CL could listen to an audiotape of what CL had told police detectives. After listening to the tape, CL said her brother was next to appellant, but AT's body was the same as everyone elses — with her head away from the television. CL felt her memory was better on the trial date than it had been on the morning following the sleepover.
 {¶ 70} CL recalled that appellant had patted AT's back, but denied any bad touching.
 {¶ 71} CL had told police that AT had a blanket on her, but said in court she was wrong when she said that. CL had also told police that AT had told her appellant had touched her (AT). CL also had told police AT started being mean to CL after AT claimed appellant had touched her. CL testified she told police appellant was nice to all her friends, not that he touched all her friends. *Page 18 
 {¶ 72} Appellant testified in his own defense. He is married and the father of four children by Cruz, three during the marriage and one before the marriage. AT arrived for a sleepover about when Cruz was leaving for work. Appellant was watching the younger son in the living room.
 {¶ 73} Appellant testified that the girls showered together and that AT still had soap on her hair afterwards. Appellant says he touched AT's hair and told her about the soap. After the soap was rinsed off, the girls went into the bedroom. Later, the girls came out to eat a bowl of cereal.
 {¶ 74} After eating, CL asked appellant if the girls could sleep near him, but he instructed CL to go back to the bedroom to sleep. While CL was talking with her father about this, AT was facing the other direction according to appellant's recollection. Appellant did not claim that they ever watched the Scooby-Doo tape together. Instead, the girls immediately went back into the bedroom after he refused to let them sleep in the living room.
 {¶ 75} Appellant denied ever telling AT to "come here." He also denied touching her in any inappropriate way.
 {¶ 76} On cross-examination, appellant acknowledged that neither AT nor CL had said anything about a shower when they testified. Nor did CL testify about eating cereal.
 {¶ 77} Appellant agreed with his daughter's estimate that the girls were in the living room for about two minutes. The assistant prosecuting attorney questioned him about whether all the things which admittedly happened in the living room could have happened in two minutes, namely of standing by the wall, CL playing with appellant, AT lying down *Page 19 
on the floor with a blanket and watching enough television to know Scooby-Doo was on the television.
 {¶ 78} Appellant acknowledged that at some time, AT's diagram of the people in the living room was correct.
 {¶ 79} On re-direct, defense counsel went over the happenings surrounding the soap in AT's hair.
 {¶ 80} The defense next called Aaryanna to the witness stand. Aaryanna testified that AT told her it was a secret, but the man was rubbing her private parts and kissing her. Aaryanna told AT's mother anyway. Defense counsel then engaged in the discussion described in the earlier assignment of error. Next, Aaryanna testified that AT said CL was asleep during the touching and that AT said appellant pulled her off the couch. Aaryanna denied AT saying appellant put his tongue in AT's mouth.
 {¶ 81} On cross-examination, Aaryanna acknowledged being nervous and scared in court. Aaryanna testified that the assistant prosecuting attorney did not tell her what to say.
 {¶ 82} The final witness was Risa Kindrix, Aaryanna's mother. Kindrix acknowledged being approached by AT, AT's mother and other members of AT's family after Aaryanna told AT's mother she had been sexually abused. Defense counsel's attempts to elicit AT's statements at that time was blocked by sustained objections, so defense counsel stopped questioning Kindrix.
 {¶ 83} The evidence at trial outlined above, supported the jury's finding of guilt. The testimony regarding AT's statements about what happened were consistent, with exceptions of the claim to Aaryanna as recalled by Aaryanna later that CL was asleep *Page 20 
and appellant pulled AT off the couch. AT's statements to other sources, including the social worker at Nationwide Children's Hospital, consistently set forth the same central facts.
 {¶ 84} The defense case had internal inconsistencies between the recollection of CL, appellant, and his wife. AT may have been wrong about how long she stayed at appellant's house the next morning, but that error does not make AT's testimony about what happened the night before unbelievable.
 {¶ 85} The testimony of Dr. Brams correctly points out that keeping a visual record is preferable to retaining only hospital records and personal recollections. However, better procedures do not mean AT was lying when she told the jury what happened.
 {¶ 86} The jury verdicts were not against the manifest weight of the evidence. The sixth assignment of error is overruled.
 {¶ 87} All six assignments of error having been overruled, the judgment of the
Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
BRYANT, J., concurs separately
KLATT, J., concurs separately.